IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*********************************
UNITED STATES OF AMERICA,                    Case No. 5:19-CR-21 (GTS)

    v.

STEPHEN J. TAUBERT,                          GOVERNMENT'S SENTENCING
                                                              MEMORANDUM
           Defendant.
*********************************

## I.    INTRODUCTION

On March 20, 2019, the defendant was convicted after a three-day jury trial on all three counts of a three-count indictment alleging that the defendant made death threats directed toward former President Barack Obama and Congresswoman Maxine Waters. The convictions were for one count each of violating 18 U.S.C. § 115(a)(1)(B) (Influencing, impeding, or retaliating against a federal official), 18 U.S.C. § 875 (Threat in interstate commerce), and 18 U.S.C. § 879 (Threats against former Presidents). The defendant is scheduled to be sentenced on April 30, 2019. For the reasons detailed below, the government respectfully requests that this Court sentence the defendant to a term of imprisonment within the advisory sentencing guidelines range coupled with a guidelines-range fine.

## II.    APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

### A.    Statutory Maximum Sentences

The government agrees with the recitation of the statutory maximum terms of imprisonment, supervised release, and fines set forth in the PSR. Specifically, the maximum term of imprisonment on Count 1 is 10 years, and Counts 2 and 3 each carry maximum terms of imprisonment of five years. PSR ¶ 85 (citing 18 U.S.C. §§ 115(b)(4), 875(c), and 879(a)). The

1

maximum term of supervised release is three years, pursuant to 18 U.S.C. § 3583(b)(2). PSR ¶ 90. The maximum fine is $250,000 per count, pursuant to 18 U.S.C. § 3571(b).  PSR ¶ 94.

      **B.**      **Guidelines Provisions**

            **1.**      **Base Offense Level and Special Offense Characteristics**

The government agrees with the Probation Office's calculation of the defendant's adjusted offense level (21) for each group of offenses and that, pursuant to the rules for defendants convicted of multiple counts, the defendant's total offense level is increased by two to 23 pursuant to U.S.S.G. § 3D1.4.[1]

            **2.  Criminal History Category**

The government agrees with the Probation Office's determination that the defendant falls into criminal history category I. However, the government respectfully maintains that the defendant's criminal history score understates his dangerousness and likelihood of recidivism, given the defendant's history of similar misconduct.

The defendant has made a number of threats similar in nature to the offense conduct. In 2013, the defendant called the NAACP in Baltimore, Maryland and threatened to burn down the NAACP building. PSR ¶¶ 53-54. As in the instant case, the defendant used racial slurs to convey

---

[1] As explained by the Probation Office, the defendant's base offense level is 12 for each count of conviction, pursuant to U.S.S.G. § 2A6.1(a)(1). The defendant's base offense level is then increased by: (1) three levels pursuant to U.S.S.G. § 3A1.1 because the jury found that the defendant intentionally selected his victims because of their actual or perceived race, color, or ethnicity; and (2) six levels pursuant to U.S.S.G. § 3A1.2(b) because the victims were government officers or employees and the offenses were motivated by the victims' status as such. Counts 1 and 2 form one group because both counts concern a threat directed to Congresswoman Waters and her staff and Count 3 comprises its own group because it involves a different victim. Because the two groups are equally serious, each scores as a single unit and results in an increase of two levels. U.S.S.G. §§ 3D1.1 & 3D1.4.

his threats. *Id.* In March 2017, the defendant visited City Hall in Syracuse, New York, where he stated that the mayor of Syracuse should be "shot down." *Id.* ¶ 57.

Additionally, as reported to the government by the FBI, in October 2017, during a telephone call with an employee of the Quicken Loans Arena in Cleveland, Ohio, the defendant threatened to show up at the arena and start shooting. This threat came after the defendant was told that a veteran's discount was unavailable for tickets to events at the arena.[2]

Finally, the defendant continued making threats of violence even after he was indicted in this case. PSR ¶ 4. According to reports from the Marshals Service, while in the federal building for his initial appearance in this case the defendant twice threatened to take the gun of a Deputy U.S. Marshal and shoot him with it. During a transport on the same day, the defendant asked Oneida County Jail transport officers if they had a gun and told them that he might take it and shoot them with it. The defendant's disruptive, abusive, and threatening behavior has continued while at the Oneida County Jail. PSR ¶7 (refusing to be booked and yelling and cursing at the staff; verbal abuse and threats toward staff; need for restraint upon refusal of all orders; throwing bloody paper towels on a cart and papers; refusal to take medication).

In summary, although the defendant's criminal history category is I, his long history of threatening and abusive behavior akin to the instant offense of conviction demonstrates that the score under-represents his criminal history.

### 3. Guidelines Range and Recommended Sentence

The government agrees with the PSR that the guidelines call for term of incarceration of 46-57 months and a fine between $20,000 and $200,000. PSR ¶¶ 86, 96.

---

[2] Information about the defendant's threats regarding the Quicken Loans Arena was provided to defense counsel prior to the jury trial in this matter.

### III.     GOVERNMENT'S SENTENCING RECOMMENDATION

A sentence of imprisonment within the defendant's guidelines range is appropriate.

The defendant has proven to be undeterred by warnings from law enforcement concerning his threatening behavior dating back at least to 2013, when he was interviewed by the FBI in connection with the threats he made to the NAACP in Baltimore, Maryland.  This visit by the FBI did not prevent the defendant from making additional threats, including against the mayor of Syracuse, the Quicken Loans Arena, and various local and federal law enforcement officials in the Syracuse, New York area.

It is against that backdrop of threatening behavior—which represents just a portion of the defendant's criminal history, as detailed in the PSR—that the defendant called the office of then Senator Al Franken and made a vile, racist death threat against former President Barack Obama. Just like in 2013, law enforcement traced the call back to the defendant.  A special agent with the United States Secret Service interviewed the defendant, and the defendant ultimately admitted making the threatening statements and promised to clean up his verbal outbursts.  At that point, having been interviewed by the FBI in 2013 and the Secret Service in 2017, the defendant could and should have taken the opportunity to change his behavior.  He did not.  Instead, he again engaged in threatening behavior in the summer of 2018, this time directing his threats toward a sitting Congresswoman and her staff, and the defendant did so while using overtly bigoted, hateful language. And, again, the threats did not stop even after the defendant was arrested on the charges of conviction in this case, as detailed above.

As found by the jury beyond a reasonable doubt, the motivation for the defendant's threats to Barack Obama and Maxine Waters was racial hatred.[3] This aggravating factor is appropriately reflected in the defendant's guidelines range of imprisonment, as is an enhancement for targeting official victims. With respect to the enhancement for official victims, the defendant had direct knowledge from prior experience that making a threat against a public official's life results in a law enforcement response that obviously takes resources away from other law enforcement priorities. Yet the defendant brazenly threatened Congresswoman Maxine Waters and her staff anyway. That threat had an impact not only on the Congresswoman herself—whose appearances at multiple events were cancelled in the aftermath of the threat—but also the staff member who testified at trial about how scared she was as a result of the defendant's threat. As of the filing of this Memorandum, the defendant has shown no remorse and has not accepted responsibility for his actions.[4]

The government understands that the defendant is not in perfect health, but there is no reason to believe that his health problems cannot be treated in prison, and the defendant's health is not an excuse for his conduct. Based on all relevant circumstances, including the nature of the offense conduct at issue and the history and characteristics of the defendant, the government

---

[3] At trial, the government presented only a small portion of the evidence of the defendant's racial animus. The full recording of the defendant's interview with Capitol Police, along with the video of his arrest during which the defendant screamed racial slurs including "nigger boy" into Capitol Police Officer Gerren Stith's face approximately 30 times, more fully show the extent of the defendant's race-based hatred. This video footage is available for the Court's inspection upon request.

[4] Based on her visits with the defendant in jail, the defendant's sister told the Probation Office that she believes that the defendant knows he crossed a line and is remorseful about how his friends will react to his comments. The PSR does not reflect that the defendant expressed remorse to his sister or anyone else about making the comments in the first place and the harm it caused the victims, although in her letter of support to this Court the defendant's sister does say that the defendant has expressed remorse for his actions.

respectfully seeks a sentence of incarceration within the guidelines range of 46-57 months and a substantial fine[5] within the advisory guidelines range.[6]

DATED:  April 22, 2019                                    Respectfully submitted,

                                                          GRANT C. JAQUITH
                                                          UNITED STATES ATTORNEY

                                                           */s/ Michael D. Gadarian*
                                            BY:   */s/ Michael F. Perry*
                                                          Michael D. Gadarian (Bar Roll No. 517198)
                                                          Michael F. Perry (Bar Roll No. 518952)
                                                          Assistant United States Attorneys

---

[5] As reflected in the PSR (¶ 83), although the defendant is represented by the Federal Public Defender's Office, it does appear that he has substantial assets and the ability to pay a fine. In connection with the Probation Office's preparation of the PSR, the defendant disclosed assets totaling approximately $140,000, available credit of approximately $65,000, and no outstanding debt. Pursuant to U.S.S.G. § 5E1.2(c)(3), the guidelines range for a fine in this case is $20,000 to $200,000. PSR ¶¶ 96-97. United States Sentencing Guideline § 5E1.2(d) provides the court with a number of factors to consider in imposing a fine: (1) the need for the combined sentence to reflect the seriousness of the offense, promote respect of the law, provide just punishment, and afford adequate deterrence; (2) the defendant's ability to pay a fine; (3) the financial burden on the defendant and his dependents; (4) any restitution obligation; (5) other collateral consequences of conviction; (6) whether the defendant previously has been fined for similar offenses; (7) costs to the government of probation, imprisonment and supervised release; and (8) any other pertinent equitable considerations. At the end of subsection (d) it explains that "[t]he amount of the fine should always be sufficient to ensure that the fine, taking together with other sanctions imposed, is punitive."

[6] The government reserves the right to respond to defense arguments raised for the first time after the filing of this memorandum. Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond. *See* Fed. R. Crim. P. 32(i)(1)(c), 32(h). Further, the United States respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendation submitted by the United States Probation Office.